LODGED

**CRIMINAL COMPLAINT**

ORIGINAL

UNDER SEAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

2013 NOV 13 PM 1:51

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE
BY:_____

UNITED STATES OF AMERICA

v.

KAWAUM MARQUEZ SCOTT, and
NEKEYIA NECOLE WEATHERSPOON,
aka "Keey Beey"

Docket No.

MAGISTRATE'S CASE NO.

ED13-0548M

FILED
CLERK, U.S. DISTRICT COURT

NOV 13 2013

CENTRAL DISTRICT OF CALIFORNIA
BY            DEPUTY

---

**Complaint for violation of Title 18 U.S.C. § 1591(a)(1)**

| NAME OF MAGISTRATE JUDGE | UNITED STATES | LOCATION |
|---|---|---|
| HONORABLE SHERI PYM | MAGISTRATE JUDGE | Riverside, CA |

| DATE OF OFFENSE | PLACE OF OFFENSE | Address of ACCUSED (IF KNOWN) |
|---|---|---|
| October 27, 2012 | Riverside County | |

**CRIMINAL COMPLAINT**                                              ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA | Docket No. |
|---|---|
| v.<br><br>KAWAUM MARQUEZ SCOTT, and<br>NEKEYIA NECOLE WEATHERSPOON,<br>aka "Keey Beey" | ED13-0548M |

2013 NOV 13 PM 1:51

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY:_____

FILED
CLERK, U.S. DISTRICT COURT

NOV 13 2013

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

---

**Complaint for violation of Title 18 U.S.C. § 1591(a)(1)**

| NAME OF MAGISTRATE JUDGE<br>HONORABLE SHERI PYM | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Riverside, CA |
|---|---|---|

| DATE OF OFFENSE<br>October 27, 2012 | PLACE OF OFFENSE<br>Riverside County | Address of ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about October 27, 2012, through October 31, 2012, in Riverside County, within the Central District of California, and elsewhere, defendants KAWAUM MARQUEZ SCOTT ("SCOTT") and NEKEYIA NECOLE WEATHERSPOON, also known as ("aka") "Keey Bee" ("WEATHERSPOON"), knowingly, in and affecting interstate and foreign commerce, recruited, enticed, harbored, transported, provided, obtained, and maintained by any means, and benefitted, financially and by receiving anything of value, from participation in a venture which recruited, enticed, harbored, transported, provided, obtained, and maintained a Child Victim, knowing and in reckless disregard of the fact that force, threats of force, fraud, and coercion, as defined in Title 18, United States Code, Section 1591(e)(2), and any combination of such means, would be used to cause the Child Victim to engage in a commercial sex act, and that the Child Victim had not attained the age of 18 years and would be caused to engage in a commercial sex act.

---

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**
 *See* attached affidavit which is incorporated as part of this Complaint.

---

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:   Not Applicable.

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>Jeffrey T. Stiff<br>Special Agent, Federal Bureau of Investigation |
|---|---|

---

**Sworn to before me and subscribed in my presence,**

| SIGNATURE OF MAGISTRATE JUDGE* | DATE<br>November 13, 2013 |
|---|---|

*    *See* Rules 3 and 54 of the Federal Rules of Criminal Procedure.

AUSA: TS:fgs

TDS

**AFFIDAVIT**

I, Jeffrey T. Stiff, being duly sworn, hereby state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since November 2005.   I am currently assigned to the Los Angeles Field Office, Riverside Resident Agency, Violent Crimes Squad.   I investigate, among other things, the sexual exploitation of children, child pornography, and child prostitution.   I have attended numerous training classes regarding the Internet, on-line child pornography, and Internet child enticement investigations.   I have also been involved in the execution of numerous prior search and arrest warrants.   Furthermore, I am currently assigned to the Inland Child Exploitation/Prostitution ("ICEP") Task Force.   This task force consists of experienced SAs and VICE investigators.   ICEP was formed to address a significant juvenile prostitution problem in the Inland Empire area.   As a result, I have experience conducting investigations involving the prostitution of children.   I also have experience conducting a myriad of violent crime investigations to include bank robberies, fugitives, drugs, gangs, kidnappings.

1

2.    The statements contained in this affidavit are based upon my training and experience, information provided to me by other law enforcement officers, including Riverside Sheriff's Office ("RSO") Deputy Daniel Engels, and on my own investigation, interviews of witnesses, and review of evidence as described herein.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.   PURPOSE OF AFFIDAVIT

3.    This affidavit is submitted in support of:

a.    A criminal complaint charging KAWAUM SCOTT ("SCOTT"), and NEKEYIA WEATHERSPOON ("WEATHERSPOON"), with violating Title 18, United States Code, Sections 1591(a)(1) (Sex Trafficking of Children); and

b.    An application for warrants to search: 23758 Black Canyon Drive, Quail Valley, California ("SUBJECT PREMISES 1"), and 18281 Haines Street, Perris, California ("SUBJECT PREMISES 2") (collectively, the "SUBJECT PREMISES"), which are more specifically described below at paragraphs 5 and 6, and at Attachments A-1 and A-2, respectively, for evidence, fruits and instrumentalities of criminal violations of Title 18, United States Code, Sections 1591(a)(1) and 1594(c), as more fully

2

described at Attachment B, which is hereby incorporated by reference into this affidavit.

4.   As this affidavit is being submitted for the limited purpose of securing a criminal complaint and search warrant, I have not included each and every fact known to me concerning this investigation.

### III.   <u>PREMISES TO BE SEARCHED</u>

5.   SUBJECT PREMISES 1 is the property located at 23758 Black Canyon Drive, Quail Valley, California.  SUBJECT PREMISES 1 is further described as follows: a two story, single-family residence, white in color with tan trim, a brown tile roof, green shutters, and green door.  The residence has a three-car garage. A sign bearing the numbers "23758" is affixed in the front of the residence above the garage door.  SUBJECT PREMISES 1 includes all structures on the property.

6.   SUBJECT PREMISES 2 is the property located at 18281 Haines Street, Perris, California.  SUBJECT PREMISES 2 is further described as follows: a single-story, single-family residence, white in color with blue trim and a tile roof.  The residence has a four-car garage and is surrounded by a black wrought-iron gate and fence on all sides.  Behind the residence, within the property's fence line, is one structure that is smaller than a typical residence.  The front door is brown and faces east.  A

sign bearing the numbers "18281" are affixed above the entrance to the front door.  The numbers "18281" are also affixed to a black mailbox in front of the residence.  SUBJECT PREMISES 2 includes the single-family residence and the grounds of the property, but does not include the structure behind the residence.

### IV.   BACKGROUND REGARDING CHILD PROSTITUTION

7.    I have spoken with defendants, confidential informants, victims and witnesses who have extensive knowledge of the inner workings of prostitution and more specifically, child prostitution.  I have also spoken with experienced VICE investigators concerning the methods and practices of those persons involved in the sexual exploitation of children through prostitution.  As a result, I have learned the following:

a.    Despite the glamorization it receives in the mass media, prostitution is not a "victimless crime".  Pimps — individuals who sell the services of prostitutes — use prostitution as a means of making money.  Unlike other illegal activities, such as drug trafficking, sex is a re-usable commodity.  For example, whereas five grams of cocaine is sold and consumed, employing prostitutes allows pimps to repeatedly sell sexual services without having to "replenish supplies."  Also, unlike narcotics, pimps can engage in business without

4

being physically present at the place of the transaction thereby, avoiding detection by law enforcement. These two aspects of the prostitution business make it an attractive and lucrative way to make money with less fear of detection by law enforcement.

b.   In order to conduct business, however, pimps need to convince females to work as prostitutes. Pimps focus on recruiting the most vulnerable females, many of whom are poor, uneducated, swayed by promises of money, and many of whom are children. Once a pimp recruits or acquires a potential prostitute, the pimp will find ways to increase his prostitute's dependence on him. The pimp will often move the prostitute to unfamiliar areas away from her home, family and friends. Pimps will encourage his prostitutes to break contact with her family, take away her belongings, and isolate her from school, friends, and the outside world — all the while convincing her that she needs and loves the pimp himself.

8.   Based on my training and experience, and my conversations with other law enforcement individuals with experience in investigating prostitution, I know that many prostitutes are initially recruited into prostitution at very young ages, ranging from approximately 11 to 15. There are known and documented cases of children even as young as 9 being recruited for prostitution. Many, but not all, of these children

5

are considered runaway or "throwaway" children, whose families have severely neglected or given up on them.  Many children recruited into prostitution have been sexually or physically abused by family members and have low self esteem, making them vulnerable prey for pimps.  Furthermore, many of these children who do not feel loved or cared for by their families run away from their families or from group homes numerous times.

9.   I know based on my training and experience that those involved in prostitution, including pimps, prostitutes, and child prostitutes often use words and figures of speech that are unfamiliar to many people.  The following is a partial list of such terms and their definitions:

a.   "Game" — Subculture of pimping and prostitution.

b.   "Pimp" — Individuals (most often male) who employ prostitutes, manage the prostitution business, and are responsible for prostitution activities.

c.   "Gorilla Pimp" — A violent pimp who often beats his prostitutes.

d.   "Stable" — A group of prostitutes that work for one pimp.

e.   "Bitch" or "Ho" — A term used by a pimp to refer to his prostitutes.

f.   "Bottom Bitch" or "Bottom" — A term used by a pimp

to refer to his most trusted prostitute.  The bottom bitch is often the prostitute who has been working for the pimp the longest.  Often times, the bottom bitch will recruit other prostitutes to work for the pimp.

g.    "Blade" or "Track" — The street or area where prostitutes work.

h.    "Circuit" — Common areas and routes of travel around the country where prostitutes travel for prostitution.

i.    "Break" or "Broke" — When the pimp takes his prostitutes' money.

j.    "Out of Pocket" — When a prostitute disrespects or defies her pimp, usually causing the pimp to punish her.

10.  Based on my training and experience, and my conversations with other law enforcement individuals with experience in investigating prostitution, I have also learned the following:

a.    Pimps recruit children into their "stable" of prostitutes because children are easily manipulated and many of these children lack the necessary love, recognition, attention and reward at home.  Pimps know this and manipulate these already-victimized children for their criminal activities and in order to make money.

b.    Individuals involved in prostitution use cellular

telephones, personal digital assistants ("PDAs"), desktop and laptop computers and maintain these items on their person and/or in their residences and/or their business fronts.  They use these devices to increase their mobility, coordinate sexually explicit activities, and to keep in touch with each other.  Based upon my training and experience, I know that criminals, specifically pimps, often provide cellular telephones to their victims as a method of control and communication.  For example, pimps often provide cellular telephones to their prostitutes so they can have instant access to them through phone calls, voice messages, text messages, instant messages, and, through PDAs, emails.

c.   These electronic devices allow individuals involved in prostitution to maintain contact with other pimps, prostitutes, co-conspirator individuals and businesses, and clients.  These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic information for co-conspirators and clients.

d.   Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephone, PDAs, desktop and laptop computers with camera and video capabilities so pimps can take photographs and videos of themselves, their victims, and other co-conspirators for the purposes of electronic advertising, promotion of prostitution and personal use.

8

e.    These same individuals will also take videos and photographs of explicit sexual activities involving minor victims (child prostitutes), which depict sexual intercourse between the pimp (and others) and the minor victim.  Pimps also take photographs of their minor victims in sexually explicit poses to advertise prostitution services.  Pimps also take photographs and videos of beatings of their prostitutes and minor victims for being "out-of-pocket" as a form of punishment and in order to deter their other prostitutes from disobeying their pimps.

f.    Another tool used by pimps and prostitutes is social networking sites such as Facebook.  These sites are used to discuss the crime of prostitution, make arrangements for employing prostitutes, and post photographs and videos about prostitution in order to advertise or recruit.

g.    Individuals involved in prostitution and child prostitution maintain records, including electronic files, related to their illicit business activities on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages.  These individuals often solicit clients through electronic advertisements and other media, such as Backpage.com.

h.    Individuals involved in prostitution and child prostitution also maintain records of correspondence relating to

9

client contact information as well as travel and lodging arrangements involved in such illegal activity.  They also maintain documents and files containing names of associates and/or coconspirators involved in prostitution.

i.   Individuals involved in prostitution and child prostitution also maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution.  They also maintain documents showing possession, dominion, and/or control of premises paid for by proceeds of prostitution, including utility statements, telephone statements, correspondence and rental or lease agreements relating to the premises to be searched.

j.   Also, individuals involved in the prostitution business commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, subjects frequently attempt to secret, transfer, and conceal the money by means, including, but not limited to, the following:  placing assets in names other than their own to avoid detection while maintaining control; laundering money through what appears to be legitimate businesses; hiding money in their homes, safes, and safety deposit boxes; or using the money to buy assets which are difficult to trace.  Records of these and other types of

10

transactions are often found at the residence and business fronts of individuals involved in illicit commercial sex.  These individuals also sometimes keep and maintain large amounts of bulk United States currency at their residences and business fronts.  Such funds are often used for everyday expenditures and to maintain and finance this and other ongoing illegal activity.  Additionally, they often amass and maintain assets at their residences and or business fronts which were generated by their illegal activity, or purchased with the cash earned from illegal activity.

     k.   Individuals involved in prostitution and child prostitution often drive vehicles, sometimes rented, leased, or registered in the names of other people, to transport themselves and co-conspirators, inter and intra state, to pre-arranged meetings with clients and/or known tracks to engage in prostitution.  These same individuals often get other persons to rent hotel rooms, pay for online postings or other items to avoid detection by law enforcement.

    11.  Based upon my training and experience, and the experience and training of other investigators with whom I have communicated, the evidence of illegal activity described above are often maintained by individuals involved on their persons, in

their vehicles and/or in their residences that they and their associates maintain, rent, reside in and/or operate.

### III.   SUMMARY OF INVESTIGATION

12.   A 14-year-old female Child Victim ("the CV"), was forced into prostitution by KAWAUM MARQUEZ SCOTT ("SCOTT") and his girlfriend, NEKEYIA NECOLE WEATHERSPOON ("WEATHERSPOON") (collectively, the "SUBJECTS").   The SUBJECTS lived in a residence on the same property as the CV.   After befriending the CV, the SUBJECTS forced her into prostitution and took all of the money she made during the sex acts.   The SUBJECTS advertised the CV on multiple occasions using the internet.   The SUBJECTS used cell phones to take pictures of the CV for the internet advertisements, and used a laptop computer to upload the pictures they took.

### IV.   STATEMENT OF PROBABLE CAUSE

13.   On January 8, 2013, a 14-year-old female, Child Victim, ("the CV"), and her mother attended a meeting with the CV's probation officer,[1] Melissa Guzman.   The CV told Officer Guzman that she was forced into prostitution by SCOTT and his

---

[1]     The CV has prior convictions for battery against a peace officer, for which she received a sentence of six months' probation, and for battery, for which she received a sentence of six days in juvenile hall.

girlfriend, WEATHERSPOON.   SCOTT and WEATHERSPOON lived in a residence on the same property as the CV.

14.   On January 9, 2013, Deputy Danny Engels of the Riverside Sheriff's Office ("RSO"), an FBI Task Force Officer ("TFO"), interviewed the CV at the Perris Police Station in Perris, CA.   I have spoken with TFO Engels and reviewed his report of this interview.   The CV told TFO Engels the following:

a.   At all relevant times, the CV's mother rented a converted garage from SCOTT and WEATHERSPOON, which was located on their property in Perris.   The CV and her mother both lived in the converted garage.

b.   The CV trusted WEATHERSPOON and often confided in her after she fought with her mother.   The CV would smoke marijuana with WEATHERSPOON and discuss her frustrations regarding her mother.

c.   On one occasion, WEATHERSPOON asked the CV what she did when she became frustrated.   The CV said she liked to dance to get rid of her stress.   WEATHERSPOON told the CV she did something similar to dancing, but was "getting dates."

d.   WEATHERSPOON explained that the word "dates" meant guys would pay to touch and talk with a female.   WEATHERSPOON told the CV that she could make a lot of money doing dates, but couldn't tell her mother.

13

e.   In October 2012, WEATHERSPOON drove the CV to her first "date" in Woodland Hills, CA.   WEATHERSPOON told the CV that, during the "date," she needed to refer to herself as "Hunnie B" and tell the man that she was 18 years-old.

f.   WEATHERSPOON took the CV to an apartment complex in Woodland Hills, CA, where four adult males were waiting. After WEATHERSPOON spoke to one of the males, she told the CV to accompany the man into the bathroom and charge him $120.00 for whatever he wanted.

g.   The CV went into the bathroom.   After the man told the CV to perform oral sex on him, she refused and left the bathroom.   Upon hearing about the CV's refusal, WEATHERSPOON told the CV to give the man whatever he wanted.   WEATHERSPOON threatened to leave the CV at the apartment if she didn't perform the sex act.

h.   The CV returned to the bathroom and performed oral sex on the man.   He gave the CV $60.00 for the sex act instead of $120.00, which was originally the agreed upon price.

i.   WEATHERSPOON demanded the CV give her all of the money.   The CV believed WEATHERSPOON would harm her or leave her in Woodland Hills if she didn't comply with her orders, and gave her the money the man had paid her.

14

j.    Afterwards, WEATHERSPOON drove the CV back to
Perris.  WEATHERSPOON dropped the CV off around the corner from
her residence in Perris and told the CV not to tell her mother
about the prostitution.

k.    On or about October 27, 2012, SCOTT and
WEATHERSPOON told the CV to pack a bag and meet them at a bus
station in Perris, CA, where the three boarded a bus to Hemet,
CA.

l.    In Hemet, SCOTT rented a room at the Diamond Inn,
2700 W. Florida Ave.  WEATHERSPOON took pictures of the CV with
her cell phone.[2]  In the pictures, the CV only wore underwear and
covered her bare breasts with her hands.  The images were later
posted in an advertisement for sex on a website, Backpage.com.

m.    SCOTT used his laptop computer to download the
images from WEATHERSPOON's cell phone and post the images on
Backpage.com.  The advertisements included the pictures taken by
WEATHERSPOON, the name "Hunnie B," and WEATHERSPOON's cell phone
number.

n.    WEATHERSPOON answered all of the phone calls from
the CV's potential dates/johns.  The SUBJECTS negotiated the
prices and arranged all the dates for the CV at the Diamond Inn.

---

[2]    According to the CV, SCOTT and WEATHERSPOON frequently
changed cell phones and cell phone numbers.

o.    Once a date arrived, SCOTT provided the CV with a condom and told her to do whatever the date wanted, except for anal sex.  He also told her to tell the dates she was 18-years-old.  SCOTT provided the CV a cell phone and demanded she call the SUBJECTS after the date was finished.  The CV engaged in vaginal and oral sex with the dates at the Diamond Inn.  The men paid her approximately $100.00 for each encounter.

p.    The CV continued to conduct prostitution for approximately two days at the Diamond Inn in Hemet, CA.  The SUBJECTS only allowed her to leave the room once in order to eat at the Denny's restaurant located across the street.

q.    On their third day in Hemet, SCOTT, WEATHERSPOON, and the CV moved to the Motel 6 at 3885 W. Florida Ave., where SCOTT reserved a room.

r.    Upon arriving at the Motel 6, the CV learned SCOTT already arranged a date for her.  She performed sex acts on the pre-arranged date and received $300.00.

s.    The SUBJECTS and the CV stayed at the Motel 6 for approximately two days and checked out on October 31, 2012.  The CV estimated she was paid approximately $2,500.00 conducting prostitution in Hemet.  She gave all of the money to the SUBJECTS.

16

t.   After returning home, the CV told her mother she was visiting friends in Los Angeles and had been gang-raped.

u.   On November 8, 2012, the CV encountered WEATHERSPOON at her residence.  WEATHERSPOON explained she had received numerous calls from potential dates.  On the same day, WEATHERSPOON told the CV's mother she was taking her to McDonald's, but drove the CV to meet a previously arranged date, which was set up by WEATHERSPOON.

v.   WEATHERSPOON drove the CV to a theater parking lot in Perris, where a date was waiting inside his vehicle. WEATHERSPOON pointed out the vehicle to the CV and told her to charge $60.00.  The CV agreed, and engaged in vaginal sex in the man's vehicle.

w.   On November 17, 2012, the SUBJECTS re-posted an old advertisement of the CV on Backpage.com.  The CV conducted a car date and received $60.00 for vaginal sex.

x.   On December 19, 2012, WEATHERSPOON picked up the CV from school and drove the CV to SCOTT's cousin's house in Hemet, CA.  The CV did not know the cousin's name, but believed she was a prostitute working for the SUBJECTS.

y.   After she arrived at the house, the CV was given zebra-striped lingerie from SCOTT's cousin.  The CV put on the lingerie and stood in the bathroom of the residence while

17

WEATHERSPOON took several pictures.  SCOTT downloaded the images and posted them on Backpage.com for "outcalls," which meant the CV would be driven to the date's location in order to perform sexual services.

z.    After posting the advertisement, the SUBJECTS arranged a car date for the CV.  She was driven to a Wal-Mart at 1231 S. Sanderson Ave. in Hemet, where she performed oral sex on a man inside his vehicle.  The CV received $50.00 for the act and immediately gave the money to SCOTT.  SCOTT used the money to purchase marijuana and unknown pills, which the CV believed were ecstasy.

aa.    That same day (December 19, 2012), the CV was driven to Riverside, CA, where the SUBJECTS arranged another car date where she met the date/john in a Subway restaurant parking lot and performed vaginal sex inside his vehicle for $60.00. While driving to Riverside, WEATHERSPOON received a citation by the California Highway Patrol (CHP).

bb.    After the car date, the CV was driven back to Hemet, where she performed sexual acts on two additional dates/johns at the Diamond Inn.

cc.    On December 20, 2012, SCOTT, WEATHERSPOON, and the CV checked out of the Diamond Inn and drove the CV to the Motel 6 in Hemet, where she previously conducted prostitution.  After

18

arriving at the Motel 6, the CV conducted a date with a man staying at the motel.  She masturbated the man in his room for $60.00.  After the date, the subjects drove the CV home.  She arrived after midnight on December 21, 2012, and told her mother she spent a few days with the SUBJECTS, but did not disclose her activities.

15.  On January 9, 2013, TFO Engels acquired a receipt from the Motel 6 in Hemet, CA, which listed SCOTT as a registered guest from October 29, 2012, to October 31, 2012, as well as November 10, 2012, to November 11, 2012.

16.  On February 21, 2013, TFO Engels obtained a copy of CHP citation number 39037RD, which was issued to WEATHERSPOON at 9:28 p.m. on December 19, 2011. The citation was issued in the vicinity of Interstate 215 North and Harley Knox Boulevard, near Perris, CA. WEATERSPOON provided the CHP Officer SUBJECT PREMISES 2 as her address.

17.  On April 15, 2013, I obtained seven advertisements for "Hunnie B" and associated records from Backpage.com.  The images attached to the advertisements matched those described by the CV as having been made and posted during their first trip to Hemet.

a.  In three of the advertisements, the customer listed an address of SUBJECT PREMISES 1.  The invoice for one of

the advertisements listed SCOTT as the customer.[3]  Six of the

invoices listed the same card reference number under "Payment

Information."

      b.   In two of the Backpage.com advertisements the

customer provided the same address where the CV and her mother

rented a room from the SUBJECTS.

    18.  On May 5, 2013, I interviewed the CV regarding the

Backpage.com advertisements received on April 15.  She told me

the following information:

      a.   The CV identified her images in all seven of the

advertisements, including the images she described to TFO Engles

during her interview on January 9.

      b.   WEATHERSPOON took all of the images with a cell

phone, and told the CV how to pose.  SCOTT and WEATHERSPOON were

responsible for uploading all the images to the Backpage.com

website, as well as arranging dates and negotiating prices for

sex with the dates.

    19.  On May 29, 2013, I obtained subscriber information for

a phone number associated with a Backpage.com advertisement for

sex on October 27, 2012, which included three images of the CV.

---

[3] The invoices for three other advertisements merely listed
the customer as "kawaum."  Two other invoices listed the customer
as "mack," and the last invoice listed the customer as "v
aguilar."

The subscriber information listed the subscriber name as "Keey Beey."

20.   On September 20, 2013, I interviewed the CV and she told me WEATHERSPOON used the nickname "Keey Bee" (the CV did not know the correct spelling of the name).   WEATHERSPOON used the name for prostitution purposes while posting advertisements of herself on Backpage.com.   The CV did not believe WEATHERSPOON conducted the acts of prostitution; rather she sent the johns/dates responding to her advertisement to other prostitutes.

21.   From reviewing the records obtained from Backpage.com, I learned that six of the Backpage.com advertisements were paid for utilizing a Green Dot pre-paid credit card, credit card number, xxxx xxxx xxxx 0636.

22.   On May 29, 2013, I obtained records pertaining to credit card number xxxx xxxx xxxx 0636 from Green Dot Corporation.   These records showed that the cardholder for this credit card number was SCOTT.   These records also show that SCOTT provided SUBJECT PREMISES 1 to Green Dot as his contact information when opening the card.

23.   Based on the investigation described below, I believe SCOTT currently resides at SUBJECT PREMISES 1.

a.   On November 7, 2013, I conducted a search of a law enforcement database for SCOTT.   The database revealed SCOTT was

21

arrested by RSO on August 14, 2013.  During his booking, he provided SUBJECT PREMISES 1 as his residence.

      b.  On November 7, 2013, I conducted a search of the California Department of Motor Vehicles (DMV) for SCOTT.  The residence currently on file with the DMV for SCOTT is SUBJECT PREMISES 1.

      c.  On November 6, 2013, I spoke with Deputy Probation Officer Tammy Olivares, who informed me SCOTT's current address on file is SUBJECT PREMISES 1.  On April 18, 2013, Riverside Probation conducted a home visit with SCOTT at SUBJECT PREMISES 1.

    24.  Based on the investigation described below, I believe WEATHERSPOON resides at SUBJECT PREMISES 2.

      a.  On November 7, 2013, I conducted a search of a law enforcement database for WEATHERSPOON.  The database revealed WEATHERSPOON was arrested by RSO on July 29, 2013.  During her booking, she provided SUBJECT PREMISES 2 as her current residence.

      b.  On November 7, 2013, I conducted a search of Choicepoint CLEAR, an online public records database, for the phone number provided by WEATHERSPOON during her arrest on July 29, 2013.  The phone number was associated with SUBJECT PREMISES 2.

c.   On November 6, 2013, I spoke with Deputy Probation Officer Kylie Robbins, who informed me that WEATHERSPOON's current address on file is SUBJECT PREMISES 2.   WEATHERSPOON last reported to Riverside Probation on August 13, 2013, and did not make any changes to her address.

25.   Based on my training and experience, individuals involved in prostitution often use cellular telephones, personal digital assistants ("PDAs"), desktop and laptop computers, and maintain these items on their person and/or in their residences and/or their business fronts.   They use these devices to increase their mobility, coordinate commercial sex activities, and to keep in touch with each other.

26.   Accordingly, based the foregoing, including my training and experience and information concerning SCOTT's and WEATHERSPOON's use of cell phones to take photographs of the CV for the creation of advertisements for commercial sex acts and use of a laptop computer to upload advertisements for commercial sex acts, I believe probable cause exists to believe that SCOTT and WEATHERSPOON possess digital devices in their residences that contain evidence or fruits of their sex trafficking activities, or that were used as instrumentalities of those activities.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27..  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital

24

devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

   b.   Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

   c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more

25

gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

          d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or

26

cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

        e.  Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was

27

once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to

show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

28.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.   CONCLUSION

29.  Based on the foregoing, I believe there is probable cause to believe that SCOTT and WEATHERSPOON engaged in sex trafficking of a child in violation of Title 18, United States Code, Section 1591(a)(1), and that digital devices that were used as instrumentalities of such violations or contain evidence or fruits of such violations will be found in the SUBJECT PREMISES.

Jeffrey T. Stiff
Special Agent, Federal Bureau
of Investigation

Subscribed and sworn to before
me on November 13 , 2013.

THE HONORABLE SHERI PYM
UNITED STATES MAGISTRATE JUDGE

30