R.E. SCOTT
R.E. SCOTT & ASSOCIATES
CBN 67465/DCBN 425778
     WSBN 24709
Maple Business Park
125 Business Center Dr. Ste. C
Corona, California 92880-6921
Telephone 951/273-9730
Telecopier 951/273-9734

Attorneys for Defendant NEKEYIA WEATHERSPOON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: ED CR 13-116 VAP (2) |
| Plaintiff, | DEFENDANT'S SENTENCING MEMORANDUM |
| vs. | |
| NEKEYIA NECOLE WEATHERSPOON, | |
| Defendant. | |

### I

### INTRODUCTION

#### A) THE CHARGE AND THE PLEA

Defendant has pleaded guilty to Count 1 [**18 U.S.C. §1594(c)** (Conspiracy to Engage in Sex Trafficking)] of a six count Indictment wherein she was charged with her co-defendant Kawaum Scott.[1] Pursuant to a binding plea agreement, [**F.R.Crim.P. 11(c)(1)(C)**] and subject to approval of the Court, the parties stipulated to recommend, *inter alia*, a base offense level of 30 [USSG §2G1.3(a)(2)], a five level increase for pattern of activity involving prohibited sexual conduct [USSG §4B1.5(b)(1)], a three level decrease for early acceptance [USSG §3E1.1(a)(b)].

---

[1]   Counts 2-6, charging violations of **18 U.S.C. §1591(a)(1), (a)(2), (b)(1)** and **(b)(2)** (Sex Trafficking of a Child)] are to be dismissed.

Further, based on an evaluation of the 3553 factors [**18 U.S.C. §3553(a)**] the parties further recommended a sentence of 84 - 168 months, ten years of supervised release[2], no fine, the $100 special assessment and restitution [PSR ¶¶1-4; Plea Agree., p. 13, lns. 11-25].

The parties are precluded from arguing that any other specific offense characteristics, adjustments or departures be imposed [Plea Agree., p. 13, lns. 9-10].

Probation has computed the total offense level at 30, 121 - 151 months, and has, *inter alia*, recommended a supervised release term of 5 years [PSR, p. 3; Recom.Ltr., p. 2]. It has also recommended the low stipulated term of 84 months [Recom.Ltr., p. 1].

Defendant agrees with the term of 84 months as recommended by Probation.

### B) DEFENDANT'S BACKGROUND AND CIRCUMSTANCES LEADING UP TO THE OFFENSE

Defendant is a 23 year old single mother of two. Her father is incarcerated and she has no contact with him. Her mother is unemployed but attends nursing school. Defendant never knew her father. She was raised by her mother until her mother was sent to jail for dealing drugs when she was 2 years. Then she went to live with her paternal grandmother in Perris. Her life with her grandmother was good.

When she was 5 years she moved back in with her mother. They lived in a very bad area of Compton which was infested with gangs, violence and drug dealing. Even after she moved back, her mother continued to sell drugs. When she was 7 years they moved in with her mother's boyfriend in Long Beach. He was a drug addict and sometimes spent all their money on drugs, forcing her to steal food and diapers from a market. He also abused her mother. When she was 14 years she yelled at him for abusing her mother and he hit her. She then ran away and stayed at friends' homes until she moved back in with her grandmother.

Her grandmother had trouble controlling her and she wound up in the foster care system in a group home. She got pregnant at 17 years. She ran away from the home and moved back in with her mother back in Compton. Shortly after she moved back in with her grandmother in Perris.

Then she met Scott, her co-defendant. She moved in with him and shortly thereafter he

---

2   As probation notes, the recommended 10 year supervised release is unauthorized by law based on the fact that maximum for the offense in question authorized by law is five years [PSR, p. 20, fn 1; **18 U.S.C. ¶3583(k)**].

became abusive and he addicted her to drugs. She would ship her son off to her mother and grandmother frequently because of the poor environment at home.

Scott got her pregnant ands they had a daughter together. The girl is 2 years now. She reports that Scott's abuse of her continued while she was pregnant and after the girl was born so she moved back in with her grandmother again. About this time, Scott began to try and convince her, to the point of harassment, into working as a prostitute with him. He beat her repeatedly and eventually she relented. But then he offered her a way out - find a girl to work for him and she would no longer have to. They rented a room in Perris and the offenses which bring her before the Court began [PSR ¶¶58-65].

Defendant introduced Scott to Keyana, a co-worker, who agreed to work for him. After that Keyana rented a car and the three of them went to Los Angeles. Defendant was dropped off at her mother's house and Scott and Keyana left. She did not see him for about 36 hours.

When she saw him again Scott told her that Keyana had attempted to have sex with him so he kicked her out of the vehicle and left her in L.A.

Two days later defendant and Scott were arrested at their apartment for taking the car rented by Keyana. Scott was also charged with making criminal threats against Keyana

When Scott was released from jail defendant was pregnant. The two moved into another apartment in Hemet.

About July, 2012, Scott moved into a family member's home in Los Angeles. Defendant went to live with her grandmother in Perris. During this time Scott first told her that she had to "ho-up" and begin prostituting for him. To this point, she  had not prostituted for Scott or anyone else. She was extremely resistant to doing it but Scott was insistent and used violence to control her.

She and a friend traveled to Los Angeles to see a rap show put on by Scott's brother. After she returned, Scott beat her up for not "choosing up" (working as a prostitute) for him. He also informed her he had a female named Latrice already working for him.

He told her she needed to make money and explained to her how to recruit girls to become

prostitutes for him. He told her to look for girls with bad hair and offer to fix it. Once done, she was to talk about money and sell them dreams about having an apartment, nice nails and nice hair. He wanted her to focus on single mothers with low self-esteem.

Finally about September, 2012, Scott was successful in getting her to engage in prostitution. He used images of other females to post advertisements for her on backpage.com.

Following that, she had three "dates". She did not like it and wanted to quit but Scott assaulted her again. He gave her an ultimatum: recruit prostitutes or do it yourself.

### C) FACTS OF THE OFFENSE

In the meantime, the victim and her mother had moved into a residence on the same property as defendant and Scott. Defendant had befriended the girl and her mother. It was not her intent to recruit the girl but just to be friendly. One night the mother informed her that the girl had run away because she had been assaulted to the point of unconsciousness by a schoolmate because she had had sex with the schoolmate's boyfriend. She confronted the schoolmate and that caused the girl to become more attached to defendant.

Scott, upon learning that the girl was sexually promiscuous, became interested in her. He told Weatherspoon to "take her under her wing". She took a trip to the L.A. area with the girl and when they returned Scott asked her when she would be ready. Defendant approached the girl asking her if she would like to make money and explaining how it worked. When defendant told Scott about the conversation he asked for pictures of the girl to post. Defendant took pictures of the girl in a bathing suit and emailed them to Scott who posted them.

Following that, they traveled to Hemet and got a motel room and the girl had some "dates" with men. Scott would leave the premise and she would wait on the stairs to make sure everything went all right. When the deed was done, the girl would place the money in a drawer for Scott. Weatherspoon never touched the money.

They did this at the Diamond Inn in Hemet and also at a Motel 6. The girl also had about ten "car dates" with a man identified only as "B" and during this time Scott was also prostituting

1 | other girls named "Titi' and "Kiki".

2 |   Defendant's involvement in the offense was the direct result of Scott's violent behavior

3 | towards her and the only way she thought she could escape being prostituted herself. She wanted to

4 | leave Scott but was afraid to do so and there is considerable evidence that she is a victim of the

5 | "battered woman's syndrome" which explains her situation (see discussion *infra*) [PSR ¶¶28, 29].

6 | **II**

7 | **CRIMINAL HISTORY**

8 |   Probation has placed defendant in a Criminal History Category III based on one

9 | qualifying criminal conviction for Taking a Vehicle without Owner's Consent [**Calif.Veh.Code**

10 | **§10851**]. As noted by probation, this offense was again the result of defendant's relationship with

11 | Scott as she was charged with the offense because of Scott's taking of the vehicle rented by

12 | Keyana (see discussion *supra*).

13 | **III**

14 | **RECOMMENDATIONS**

15 | **A) PLEA AGREEMENT**

16 |   Defendant and the Government have entered into a Plea Agreement which provides as

17 | follows:

18 |   <u>Count 1 (Conspiracy)</u>        84 - 168 months

19 | **B) PROBATION RECOMMENDATION**

20 |   Probation accepts the recommendations made in the Plea Agreement and recommends a

21 | term of 84 months [Recom.Ltr., p. 1].

22 | **IV**

23 | **DEFENDANT'S SENTENCING ANALYSIS**

24 | **A) THE COURT IS OBLIGED TO IMPOSE THE LEAST PUNITIVE SENTENCE THAT SATISFIES THE GOALS OF 18 U.S.C. § 3553 (a)**

25 |   The sentencing guidelines are no longer mandatory [*U.S. v. Booker* 543 U.S. 220 (2005)].

26 | Consequently, District Courts "may not presume that the Guideline range is reasonable" [*U.S. v.*

*Carty* 520 F.3d 984, 991 (9th Cir., 2008) (*en banc*); *Rita v. U.S.* 127 S.Ct. 2456, 2465 (2007)].

Although they should be "respectfully considered", the Guidelines should not be accorded more

weight than other **18 U.S.C. §3553(a)** factors [*Carty,* at p. 991; *U. S. v. Cantrell*, 433 F.3d 1269,

1279-80 (9th Cir., 2006). Following *Booker*, sentencing courts must craft sentences that are

appropriate in light of *all* of the section 3553(a) factors [*Gall v. U. S.*, 128 S. Ct. 586, 596

(2007); *Carty, supra,* 520 F. 3d at 991].

Indeed, courts must sentence below the advisory Guidelines range if such a sentence would

be sufficient to meet the statutory goals of sentencing. [See **18 U.S.C. § 3553(a)** and **(a)(2)**].

District courts have an "overarching" obligation to impose sentences that are "sufficient, but not

greater than necessary" to achieve the goals of sentencing [See **18 U.S.C. § 3553(a)**; *Kimbrough v.*

*United States,* 128 S. Ct. 558, 575 (2007); *Carty, supra,* a p. 991]. The so-called parsimony

principle is the most important factor in a court's sentencing decision [Kimbrough, 128 S. Ct. at

575; *Carty*, 520 F.3d at 991]. Clearly, any consideration of the advisory Guidelines range is

secondary to the overriding edict that a sentence may not be greater than necessary.

It is also important to emphasize that the Court's obligation is not to impose a "reasonable"

sentence, but to impose particularized sentences *minimally* sufficient satisfy the aims of section

3553 (a)(2). [*See Carty*, 520 F.3d at 991 ("The district court must make an individualized

determination based on the facts."). After Booker, there will be circumstances where a Guidelines

sentence will exceed what is "necessary" to comply with section 3553 (a).

Hence, the beginning of any analysis of the appropriate sentence is a consideration of the

factors enumerated in **18 U.S.C. §3553(a)**. While defendant does not in any way intend to diminish

the severity of the charges to which she has pled guilty, she does urge the Court that a reasonable

appreciation of the enumerated factors postulates the ultimate conclusion that Probation's

recommendation is not unreasonable.

Whereas the "nature and circumstances of the offense" [**18 U.S.C. §3553(a)(1)**] have been

exhaustively discussed in Probation's Recommendation Letter and the PSR, the "need for the

sentence imposed" [**18 U.S.C, § 3553(a)(2)** is what defendant would ask the Court to focus on. First, the recommended sentence will do nothing to diminish the need to reflect "the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" [**18 U.S.C. §3553(a)(2)(A)**]. There is ample evidence before the Court of defendant's sincere remorse for what she did, both by accepting responsibility for her acts and because of the mitigating factors discussed below.

It should be remembered that when defendant started out she was a victim of Scott's desire to make money from prostituting her body. It must be remembered that she never handled nor got any of the money. That was all Scott. She did not benefit in any material way from the offenses involving either herself or the victim. Whereas Scott was motived by greed she was not. She was merely seeking an escape from the cycle of violence in which she had found herself. Her only motivation was to avoid the violence and self preservation.

While her decision to "play along" with Scott's plans clearly was not a good one at the same time it was the only way she saw as a way out of her predicament. While it can be argued that she could have just left, the overlay of the Battered Woman's Syndrome makes than less than a viable alternative.

The same argument equally applies to an evaluation of the necessity of affording an adequate deterrence to criminal conduct [**18 U.S.C. §3553(a)(2)(B)**] and protecting the public from further crimes of the defendant [**18 U.S.C. §3553(a)(2)(C)**] - and, lastly, defendant suggests that if she can escape from men like Scott and the drug culture in which she has become so enmeshed she has the intelligence and support to provide for her family in a lawful and meaningful manner [**18 U.S.C. §3553(a)(2)(D)**].

Again, defendant had engaged in no criminal behavior before Scott and her involvement in the instant offense. That is surely a mitigating factor.

**B) DEFENDANT'S CRIMINAL HISTORY CATEGORY OF III SERIOUSLY OVERSTATES HER CRIMINAL BACKGROUND.**

Defendant went from a Criminal History category of I to III based on one conviction. And

that conviction again finds its' genesis with co-defendant Scott.

As discussed *supra,* defendant's friend Keyana rented a car and the three of them went to Los Angeles. Defendant was dropped off at her mother's house and Scott and Keyana left and she did not see him for about 36 hours. When she saw Scott again he told her that Keyana attempted to have sex with him so he kicked her out of the vehicle and left her in L.A. Two days later defendant and Scott were arrested for taking the car [PSR ¶28(c)(d)].

Defendant is not arguing that she is not guilty of the offense. She is arguing that without Scott as the prime mover she never would have been arrested or convicted. Her involvement was because "they" had possession of the vehicle when the police came looking for it. Additionally, it was Scott who literally forced her into the present offense. Without him, it is clear that neither offense would have been committed.

Defendant suggests to the Court that a category of III based on the above seriously overstates her criminality and the Court should consider that when determining whether or not to accept the recommendations and what term to ultimately sentence her to.

**C) THE PARTIES ARE PRECLUDED BY THE PLEA AGREEMENT FROM ARGUING ADJUSTMENTS OR DEPARTURES BUT THERE ARE MITIGATING FACTS WHICH THE COURT SHOULD CONSIDER WHEN DETERMINING WHETHER OR NOT TO ACCEPT THE BINDING RECOMMENDATION AND WHEN DETERMINING WHAT TERM TO SENTENCE DEFENDANT TO**

**1) MITIGATING FACTORS**

Defendant wishes the Court to consider the abundance of mitigating factors present in this matter. First, her childhood: born of a broken relationship; never knew her father who is in prison; raised by a drug selling mother in a gang infested neighborhood and by a grandmother who could not cope with her; time spent in a group home in foster care; an early pregnancy and no prior criminal history until she met Scott. And then there was Scott: defendant was 17 years old when she met him; he fathered a child by her; he addicted her to drugs, indeed, she even says she took drugs to be more more "mentally submissive" to him [PSR ¶76]; he intimidated her by violence and mental abuse to first force her into prostitution and then to be a procurer <u>for him</u>. It is clear that

what she did she did voluntarily but not willingly. She was forced into it and, lacking any other alternative in her view [see discussion *infra*], she complied with his demands. While defendant does not minimize her offenses and while she acknowledges the severity of the offenses, she also wishes the Court to note that she, throughout the affair, was a vulnerable victim herself and it was that vulnerability that Scott capitalized on. The horrors of her life are more specifically detailed in the report of Nancy Kaser-Boyd, Ph.D., A.B.A.P., filed herewith as Exhibit "A", but suffice it to say that the horrors of defendant's childhood are exceeded only by the horrors of her life with Scott - - horrors which continue to this day:

> "I have nightmares. I wake up screaming. I feel like he's choking me.
> I wake up in a cold sweat. It feels like he's everywhere. I dreamed that
> I was just laying, asleep and he broke in and raped me. Terrible dreams.
> I begged them not to take me to Court with him. I pray before I go to
> sleep, but I still have nightmares. I don't understand what he did to me.
> I was almost going to plead to the charges, say it was me that did every-
> thing, until my grandmother told me she would disown me. He is in my
> head. I can't get him out" [Kaser-Boyd report, Exh. "A", p. 10].

The evidence before the Court that defendant was victimized by Scott is compelling and, again, while she was also a perpetrator, her primary status is that of a victim at the hands of Scott.[3]

As Probation notes, under normal circumstances "These factors may form the basis for a variance from the guideline sentencing range" {PSR ¶105}.

---

[3] It is somewhat of an irony that if defendant had continued to submit to Scott's demands that she prostitute herself for him she would likely be facing either a considerably reduced prosecution for prostitution or none at all. Nor is this an unusual phenomenon. **Calif.Evid.Code §1161**, for example, anticipates this anomaly where it provides an essential immunity to the victims of sex trafficking: "(a) Evidence that a victim of human trafficking, as defined in Section 236.1 of the Penal Code, has engaged in any commercial sexual act as a result of being a victim of human trafficking is inadmissible to prove the victim's criminal liability for the commercial sexual act. (b) Evidence of sexual history or history of any commercial sexual act of a victim of human trafficking, as defined in Section 236.1 of the Penal Code, is inadmissible to attack the credibility or impeach the character of the victim in any civil or criminal proceeding."

## 2) "BATTERED WOMAN'S SYNDROME"

Dr. Nancy Kaser-Boyd evaluated defendant. Based on her evaluation, psychological testing and her training and experience it is her conclusion that defendant suffers from Battered Woman's Syndromw [hereafter "BWS"] and Posttraumatic Stress Disorder {hereafter "["PTSD"]. Nor is there anything counterintuitive about the diagnosis. It is almost inconceivable that anyone suffering through the childhood defendant went through and then the relationship with Scott could do so without significant *sequalae* - - and Dr. Kaser-Boyd's diagnosis confirms that conclusion.

As to the BWS and PTSD she notes that defendant was dominated and controlled by Scott by means of violence and intimidation for over a year and that the abuse consisted of beatings, threats, verbal abuse, humiliation and at times keeping her as a prisoner. He then was able to coerce her into becoming a prostitute - an avocation which was anathema to her.[4] As Dr. Kaser-Boyd notes, for defendant her involvement in prostitution and in this offense was not a matter of greed or a desire to make money - - it was a matter of survival - - and, in the long run, her assessment of the situation was an accurate one.Additionally, her inability to get away from Scott, both premised in her own fear of what he would do and his tendency to "stalk" her when she tried, only served to make her more and more desperate.[5]

In sum, while defendant is certainly culpable for the offense the horrors of her life, especially the horrors inflicted by Scott, mitigate her involvement in the offense to a substantial degree.

## 3) ABERRANT CONDUCT

The Court, under the Guidelines, has the power to impose a downward departure for aberrant behavior under the following circumstances:

" . . . only if the defendant committed a single criminal occurrence or

---

[4]   Defendant urges that her prior experience as an exotic dancer ("stripper") in no way equates to the activities which Scott forced her to engage in.

[5]   Indeed, even now, when they are both in prison and have no contact except when being transported to court together, she feels trapped in his web; and it is likely that component of her psychological trauma as a result of the relationship will continue long into the future and, without treatment, conceivbly for the rest of her life.

single criminal transaction that (1) was committed without significant

planning; (2) was of limited duration, and (3) represents a marked

deviation by the defendant from an otherwise law-abiding life"

[USSG §5k2.20]

Of course, defendant is not requesting the Court to impose a downward departure herein but she believes that the applicability of the aberrant conduct concept is something the Court can consider in deciding whether or not to accept the plea recommendations and then, if so, what ultimate sentence to impose.

All one need do here is look at the facts: a 17 year old girl, the product of a dysfunctional childhood, taken in by a control hungry, violent man of older years and manipulated through violence and intimidation to do his bidding, addicted to drugs by her paramour and then exploited by him first as a prostitute and then as a procurer. And there is the criminal conviction, also initiated at his behest. Before she met Scott defendant had a totally clean criminal record. He was the prime mover not only in the instant offense but also in the prior conviction.

There is absolutely no evidence that defendant would ever have become involved in prostitution without Scott - - either as a prostitute or as a procurer. Indeed, the evidence indicates that the mere thought of that was abhorrent to her and that the only reason she began procuring for him was because of her anathema with what he was making her do. Defendant suggests that that is aberrant conduct which the Court should consider when imposing sentence.

# V

## DEFENDANT'S RECOMMENDATION

Defendant recommends to the Court that, for the reasons stated *supra*, the Court accept the binding recommendations and impose an 84 month sentence and a term of 5 years of supervised release.

RESPECTFULLY SUBMITTED,

R.E. SCOTT & ASSOCIATES

Dated:   08/17/2014                    By:_____/s/_____
                                       R.E. SCOTT, Attorneys for
                                       Defendant NEKEYIA WEATHERSPOON

# EXHIBIT "A"

# NANCY KASER-BOYD, PH.D.

CLINICAL AND FORENSIC PSYCHOLOGY

12725 VENTURA BLVD. SUITE K
STUDIO CITY, CALIFORNIA 91604
TELEPHONE (818) 506-0719
FAX (818) 506-0638

August 13, 2014

R. E. Scott
Attorney at Law
R. E. Scott & Associates
125 Business Center Drive, Suite C
Corona, CA 92880

Sent by Facsimile: (951) 273-9734

RE: *Nekeyia Weatherspoon*, Case No: ED CR13-116VAP(2)

Dear Mr. Scott:

This is a report of my forensic mental health evaluation of Nekeyia Weatherspoon, conducted at your request. Essentially I was asked whether she had Battered Woman's Syndrome or the effects of Intimate Partner Battering.[1] I

---

[1] I am a clinical and forensic psychologist with expertise in the effects of Intimate Partner Battering [IPB], also called Battered Woman Syndrome. I also have expertise in Posttraumatic Stress Disorder. I completed my doctorate in clinical psychology in 1980 at the University of Montana and took postdoctoral training in psychiatry and the law at the University of Southern California's Institute of Psychiatry and the Law, completing the training in 1981. I am a Diplomate [i.e., Board Certified] of the American Board of Assessment Psychology. I am an Associate Clinical Professor at the Geffen School of Medicine at U.C.L.A., where I teach psychological assessment and specialty topics [such as violence risk assessment and malingering] to pre-doctoral and post-doctoral trainees. I am also a lecturer at the University of Southern California School of Law, in their Post-Conviction Justice Project. I have served as a consultant to the Board of Prisons in the past on the issue of mental illness and dangerousness.

My clinical and forensic practice, as well as my research, has largely focused on the effects of violence. I was a research assistant to Dr. Lenore Walker in 1976-78, when she was conducting seminal research on battered women. My doctoral dissertation was on physical child abuse. Subsequent research concerned malingering, specifically whether Battered Woman Syndrome could be "faked." Since licensure in California in 1982, I have seen over 1,000 battered women for evaluation or treatment. I have been retained as an expert on the effects of Intimate Partner Battering on many occasions, by both the prosecution and the defense. I have been qualified as an expert in many counties in California, as well as in the states of Alaska, Oregon, Hawaii, and Guam, and in Federal Court. I have lectured about Battered Woman Syndrome and the effects of IPB to the American Bar Association, California Attorneys for Criminal Justice, the California Public Defender's Association, the Los Angeles County Bar Association, USC's Law School students, and the Los Angeles County Jail staff, the California Parole Board, and groups of psychiatrists and psychologists and gynecologists at the Geffen School of Medicine at UCLA. I have taught continuing education seminars for psychologists on the effects of IPB. I have authored a number of textbook chapters or articles on the effects of IPB or Battered Woman Syndrome, and these appear on my Curriculum Vita, which is available on request. I have served on the Los Angeles County Superior Court Psychiatric [i.e., 730] Panel since 1995 and have evaluated many cases where murder is alleged [with female and male defendants], and have been appointed by the defense and prosecution and testified about a number of mental states

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 1

understood that she is charged with human trafficking and the charges result from the discovery that her boyfriend that she held a child victim, in violation of Title 18 U.S. Code Section 1591E2, causing the child to engage in a commercial sex act. I received background documents which included:

- The Criminal Complaint (including a summary of the investigation).
- The Plea Agreement.
- Handwritten letter from Ms. Weatherspoon.
- Private Investigator Alfredo Rasch's Report, identifying witnesses to domestic violence and likely police reports.

### Instant Offense

In January, 2013, a 14-year-old girl reported to her probation officer that she had been induced into prostitution by the co-defendants, Kawaum Scott and Nekeyia Wetherspoon. She described various incidents of forced prostitution that occurred between October and December, 2012, in cities such as Woodland Hills, Hemet and Perris. She indicated that Ms. Weatherspoon drove her or accompanied her to some of these sites, for prostitution, and both Scott and Weatherspoon accompanied her on other occasions. Scott posted pictures of her on the Internet, to attract clients. She was not allowed to keep any of the money she was paid.

## EVALUATION PROCEDURES

Nekeyia Weatherspoon was evaluated at the Metropolitan Detention Center on August 7, 2014 and August 13, 2014. She was subjected to two lengthy forensic psychological interviews and psychological testing which included the Personality Assessment Inventory, a comprehensive test of psychiatric symptoms and personality traits. Ms. Weatherspoon was cooperative with evaluation procedures.

## EVALUATION DATA

Nekeyia Weatherspoon appears as a slender African-American woman aged twenty-three [DOB: 7/25/91]. Her affect was observed to be depressed, with a flat facial expression and considerable tearfulness on certain topics. She is of average intelligence, though undereducated for her age, and could present her history in a relatively linear fashion. She understood the informed consent procedure and did not ask questions.

---

associated with homicide [i.e., beyond the effects of IPB]. I have also evaluated approximately 200 women charged in Federal Court, typically to understand the role of Battered Woman Syndrome in the instant offense.

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 2

## *Psychosocial History*

Nekeyia indicates that she was born in San Bernardino but soon moved with her mother to Compton.  When she was still a toddler, her mother was arrested and sent to jail.  During this time she lived with her grandmother in Perris and this continued until she was five and a half or six years old, when her mother was released.  She states her father was "in jail my whole life so I don't remember him."  Life with her grandmother in Perris, she states, was good and when she moved back with her mother, to 122nd and Willowbrook, she states that it was a "rough, big change."  She states that she was more well-educated and had better behavior than the kids around her in that neighborhood.  She said:

> "There were a lot of gangbangers and drugs and the apartment building was nasty, but I had to adapt.  My cousins and their friends were teasing me and bullying me.  I had to change to the way they were.  I got more involved with people in the hood."

Nekeyia states that when she was seven or eight years old her mother met a man and moved the family to Long Beach.  She said "He was beating her.  It tormented my mind but I had to adapt."  She states that the beating was frequent and severe.  Recounting one time when he wanted her to clean, she said, her mother told her "stepfather"  that no little girl was going to do that kind of cleaning and "He beat her so bad and ripped all her clothes off and threw her outside.  All my friends saw it.  It was horrible."  She said that sometimes the police came and other times not.  Usually when the police came, she said, her mother would refuse to sign a complaint, she said, and the police would leave.

When she was nine, the family moved back to Compton, living off of 120th and Wilmington, where there was more abuse.  They then moved to 43rd and Central to a small house owned by her grandmother.  She said her stepfather got "a little more calm and he was working."  However, when she was about eleven…

> "…it started up again.  He smoked a lot of marijuana and would use the last of our money to purchase weed.  We would run out of food and diapers because he was out of control.  By then I was about twelve.  He would beat my mother if she wouldn't give her money, so we had no money, and I started stealing food and diapers, diapers for my little sister (ten years younger)."

Nekeyia also tried to make money "doing hair."  She gave the money to her mother for food and "little things" for her family.  This went on until she was fourteen.  She said:

> "I had started high school.  One time my cousins were over and he started beating my mom bad.  I went and got a broom to get him off of her.  My

cousin called the police.  My mom told the police nothing happened.  She was afraid we would be taken (by DCFS).  The next morning he was in her bed!  I couldn't take it anymore and I ran away.  I ran to my friend's house, and her stepfather woke me up where I was on the living room couch and said if I was staying there I had to have sex with him, so I ran away and slept at a park.  I wanted to get on a train and go to my grandmother's.  A bus driver took me to the Greyhound Station and a Greyhound worker lady let me call my grandmother, and I got on a train and she came to pick me up."

Nekeyia states that life with her grandmother was a lot better but she feels she was already damaged by the life she had.  She said "With my grandmother I was out of control.  If anyone looked at me the wrong way, I was angry.  She couldn't control me and finally I went in the system (Dependency)."  Nekeyia states she went to a group home in Rubidoux when she was fifteen.  She suddenly became very tearful and said that she had gotten pregnant during this time because she ran away from her group home.  She went to stay with a boyfriend.  This was the first person she loved.  She had a miscarriage one day while she was at school.  She told no one other than her best friend.  She said she didn't even tell her mother or her sister.  The night of the miscarriage she ran away, out of fear that if the group home had discovered she was pregnant, there would be punishment.  She moved in with two girls of seventeen and eighteen who had their own apartment.  This was not an improvement.  Nekeyia said "One of them was a drug dealer and one was a stripper.  She told me she made a lot of money and I could make money, too.  I love to dance so I asked if her I could.  First she told me no and then she let me and I started stripping."

Asked how she felt during the time period of stripping she said "I was using so much ecstasy and weed that I was just numb.  I was out of control."

Nekeyia said she started using drugs after a serious car accident.  This was during the time that she was a runaway.  She was a passenger in a car that was hit and she had an injury to her face and head.  She points to the top of her forehead.  She was briefly unconscious.  When she came to, she went inside a gas station bathroom and tried to clean up.  The paramedics arrived and she said…

"…because I was a runaway I didn't want to go to the hospital.  The paramedic took care of me.  He told me he would stitch me up and not turn me in.  They stitched my face.  It didn't heal right and I felt deformed and that's when I popped my first Ecstasy pill.  My roommates were popping them, so I did try it and it made me feel free."

Nekeyia said that her roommate took her to parties where they stripped.  This went on for some time.  At a point she visited her grandmother.  She said:

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 4

"I was so skinny she begged me to turn myself in.  I did.  The judge said to me 'What do I need to do to help you stay in a group home?'  I told him 'Put me in Perris near my grandmother where I can have weekend visits.'  He did this but that was back in my neighborhood and with my old crowd. so I didn't get better."

Nekeyia said that in that group home she used to pay the staff to look the other way when she left to go strip.  By then she states she was about sixteen and a half.  She clarified that she was just stripping, not prostituting.  During this period of time she had little, if any, contact with her mother.  She said that she had residual anger at her mother for the life they had but gradually they reconciled.  On a visit to her mother in Compton she met "this dude from my hood" and during the early part of the relationship became pregnant.  She said "He told me to kill it and that broke me because I had already lost one.  I felt used and disgusted.  When I was five months pregnant, he went to jail for robbing a bank and I had my baby."  This is her older child who is now four years old.  She said "I started going to school and doing anything to hustle to make sure my baby had stuff.  I made promises to myself to take good care of him.  I didn't want no man who wouldn't respect his son.  I think I was a lost soul, though.  I didn't know where I was going.  The baby would look at me and smile (tears) and I didn't understand why.  When I had him, everything in my life paused.  Me and my mom then got into it and I left Compton and went back with my grandmother in Perris.  My grandmother supports me through everything and she let me move back with her.  I had just turned eighteen.  It was in Perris that I met up with my old friends, girls and their kids, and that's where I met Kawaum (Kawaum Marquez Scott, the co-defendant).

Nekeyia said that she Kawaum Scott at a park, where she had gone with her girlfriends.  She said:

"Out of the four of us, he came to me.  I don't know why, I think he sensed that I was vulnerable, maybe like a predator does.  He came to me and said 'I want to take you out and give you a nice time.'  He had his own car, and he was really just like, it was, like, too good to be true.  My best friend said, 'Kia, be careful,' but it felt like he was saving me.  We started dating and going out.  After four months, he got me an apartment in Lake Elsinore, a two-bedroom, two-bath condo.  My grandmother was keeping my son for me when I moved with him.  He was treating me so good, giving me money for shopping.  My apartment was fully furnished.  It was wonderful.  I was getting my hair done all the time, and my nails.  I didn't know where his money came from.

But in Elsinore, he started putting his hands on me.  He told me 'Make sure you keep the house clean and cook.  I was using pills (Ecstasy)

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 5

because he sold them, and he sold Weed.  So one time he came home and he asked me to warm up his food, and I said 'You know how to push the buttons.'  He just back-handed me, cussing, yelling, and pointing in my face.  My mind told me to pack my shit and go, but my heart was telling me to stay.  He left.  Then he came back and had sex with me.  He told me I had to do what he said and not talk back.

Two weeks later, I was out with my friend, for quite a little while, and my phone died.  When I got home, he snatched me down by my hair, threw me on the floor, locked the front door, and started **beating me**, like real bad.  He locked me in a room and said 'If you come out this room, I will kill you.'"

It was about July 2010.  Nekeyia said that she was kept locked in the room for three days.  She continued, very tearfully:

"I was waving to the neighbors for help and they just kept walking.  Then on the third day, I woke up and it was a little card and a chain necklace next to me, and he said he would be home and he is going to take me for a night out, to get dressed, and he told me he loved me, so everything I thought about leaving just went away.  But the hitting continued."

Nekeyia said that on one of the occasions when Kawaum was beating her, a neighbor called the police, and when they came, he had outstanding warrants.  She learned that he had been committing robberies at Macy's and other department stores.  She said she learned that he was getting "$30,000 at a time and he had female accomplices inside the stores."  Nekeyia said Kawaum "had a good attorney and they couldn't prove it all, so he got probation."  She said, however, that Kawaum "didn't cooperate with probation so he went back to court and he got one year."  This was between December 2011 and April 2012.  Nekeyia moved back with her mother, and went back to stripping.  She used her money to put on his books, and she visited him every Thursday, Saturday, and Sunday, taking the train and the bus out to the regional jail of Riverside County.  She said, "It was a lot, with a kid, so I ended up getting an apartment in Hemet, and when he got out, he joined me."  By then, Nekeyia was 19 years old.  She continued:

"So in that apartment, his brother gets out of jail and comes over in this Porsche truck (SUV) and he tells him how to start pimping.  Kawaum sat me down and told me it all.  I was blown away.  He gives me an ultimatum, that I prostitute or I find him a prostitute (crying).  I couldn't believe that he would degrade me like that.  He said he need more money, so I need to prostitute.  By then I was trying to avoid arguing and getting my ass beat, so I said 'OK, whatever.'  Then he comes up with this girl and she was with it.  We all get in the car and head for Los Angeles.  He dropped me

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 6

off at my mom's and said, 'She tripped, she flipped out.' I said, 'You mean you left her?' So then, two days later, he tells me to go to the store for some party things. Me, my son, and my sister are in the car and a whole Swat Team comes. I guess she reported the car stolen. She told police that he forced her to go in with some men and she got raped. We were looking at 19 years, for grand theft auto, terrorist threats, and kidnapping. Kawaum said I needed to just tell them that I did it because he would do a lot of time. That's what I did, and he pled to accessory.

I found out I was pregnant with my daughter, his child, when I went to jail.

Nekeyia said that she was in custody for two months in Riverside. When she was released, she returned to live with Kawaum. Then, during her pregnancy, she turned up with Chlamydia, and she knew that she wasn't the source. She confronted him. She said, "and he beat me up and called me trash….He stomped me out all in my ribs and in my private parts and told me I was dirty. I couldn't walk because my private part was swole. Later, I learned that the girl he was sleeping with had it. He never apologized." During this time period, she said that Kawaum also posted naked pictures of her on Facebook and Instagram when she refused to give him her welfare money. She said, "They weren't just nude pictures. They were pictures of my vagina, my butte, my body parts, until I gave him the money."

In June, 2012, the couple gave up the Hemet apartment and moved back to Los Angeles. She moved with her mother and he moved with one of his relatives. She was pregnant. During this time, on one occasion of domestic violence, she said Kawaum "socked me and I fell and hit my back and I almost had a miscarriage. I went to the hospital. He came in and said 'Is the baby alright?' They told me the baby seemed OK and I told him. Then he took me tight by the arm, and said 'Bring your ass up out the hospital.'" Another time, when she was "big, pregnant, he was beating me and slapping me, at a park, and a lady got out of a car with a crock pot, ready to hit him, and said to him 'You fucking crazy hitting a pregnant woman like that?'" Nekeyia said that, by then, "I felt like crap. He would say bad things to me, like 'That why your dad don't want you.' 'You don't listen.' 'You ugly.' 'You lucky I want you.'

Nekeyia gave birth to her baby girl (Kawaum's child) on August 21, 2012. Kawaum's physical abuse and utter disregard for her continued. She said:

"I just gave birth, and he told me I had to make a choice, I had to get him money (by prostituting) or find someone. He posted one of my swimsuit pictures and he put it on the Internet. I was still bleeding from giving birth (beginning to sob). He was serious. So I tried it (prostituting) one time. I felt like fucken dirt. That wasn't me (i.e., prostituting)."

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 7

Still sobbing, Nekeyia said that she has never told anyone this, and she is worried that her mother and grandmother, or sister, will find out. It seems clear that it was at this point that she brought in the 14 year-old neighbor-victim. Asked how she could expect a young teenager to feel different than she felt, she again sobbed and said, "I didn't want to do that to her. I was afraid of him and what he would do to me. Everyone knew I was afraid of him." Kawaum was still beating her during this period. She recounted an incident when the baby was about two months old when Kawaum smacked her hard while she was holding the newborn, and the baby fell into the stroller. She said, "If the stroller hadn't of been there, she probably would have been killed." Nekeyia said that she made up her mind around Thanksgiving 2012 that she was going to leave Kawaum, and by January, 2013, she had moved back to her mother's. The abuse continued, however. She said,

> "In January, him and his mom kidnapped my daughter, wouldn't give her back. I called the police and they said they couldn't do nothing, so I went back to him in January, but then I left him again in February."

Nekeyia said she wanted to get her life together and stay away from Kawaum. She enrolled at El Camino Community College, and began to attend. Her mother watched her children. She said she started to feel happy and optimistic. She continues:

> "I met this guy, Jay, and he was real cool. He would visit me at my mom's house and we would watch movies. Then I was out with my friend and my sister. We were on our way home. My sister was in another car, and then she called me and she said 'I see Kawaum sitting in his car watching you.' Then he pulls up as I'm walking to the house and jumps out the car and says 'You trifling bitch!' Then he says that the guy, Jay, is his friend, and Jay told him everything we been doing."

Nekeyia was stunned by the duplicity of Kawaum. She felt he would always keep control of her and that it was hopeless to get away from him. She continues:

> "This other time, when I had moved back, he called me and wanted me to look at his new car. He picked me up, and he drove me to Century Blvd., where the hookers are. He made me get out the car and he left me. He had broke my phone. He broke so many phones. I was stranded there and I had to walk all the way home, I don't know how far, but really far."

In about May, 2013, Kawaum told her that his behavior was due to the fact that he was "using a lot of drugs," and he was sorry. As a result of his apology and her feeling that he was still controlling her, in May, 2013, she moved back in with him, and rented an apartment in Riverside. This stay was short-lived and marked by rather extreme violence. She said:

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 8

"One time, when I asked him to pick me up from the bus station, I got in his car and he asked me for gas money.  I didn't have it.  He took me to Perris and told me to get out the car and he kept socking me and socking me.  I'm stuck in the seat belt. I just had my nails done. He's hitting me in my face and all over and my nails are breaking off from defending myself.  The security guard at the bus station came.  I picked up my purse and started running, and he is chasing me in his car and I am screaming.  I was near my friend Cory's house and he came out, luckily, and helped me.  I had a gash in my eye, my lip was busted and bleeding and my nails were all bleeding.

In that apartment (in Riverside), he hit me and my kids were there.  My son was screaming at him.  I was boiling water, and I threw it at him.  It caught him on the sleeve of his shirt, and he went in to get the shirt off him.  I snatched my kids and I ran to my neighbor's house.  My neighbor gave me a bat and I went and busted out all the windows of his car. Then I started running and he was chasing me and I ran and got into the neighbor's house.  The neighbor told him to leave me alone.  He said, 'OK, I got it.'  Then he went to the apartment and he destroyed everything, I mean everything.  He poured ketchup, mustard, mayonnaise, cleansers, bleach, and everything on the couch and all over the furniture, and my clothes.  He kicked in the flat screen TV.  He pissed on all the walls, and on my clothes.  It was horrible.   Then he sent me a text message that said, 'You can come home now.'  That's what I came home to.  I called the police, but they said it would be better not to file charges because I would be charged, too, for taking a bat to his car.  I cleaned for 3 days.  I had to throw all of my clothes away.  The only thing he didn't piss on or destroy was the kids' room."

Shortly after this, in June, 2013, Nekeyia found out that Kawaum had talked one of her girlfriends into prostituting for him.  She said she decided "I was done with him."  However, she continues to feel plagued by Kawaum, both because of his actions and because of the development of severe effects from the violence, which I will describe below.  Nekeyia was arrested in November 2013 for the current charges.

After she left Kawaum, he stalked her via the Internet.  He tracked the modeling picture she was posting (modeling swimwear) and reposted them with insulting comments.  He tried to hook her back into relationship.  For example, he asked her to bring their daughter to a family birthday party in Menifee.  When she arrived, he tried to coerce her into coming inside.  When she refused, he began to yell and threaten.  She grabbed her daughter out of her car and began running down the street.  She said she was so scared that she urinated all over herself.  Someone called the police and they helped her get back to her car with the baby

and leave the location.  Since she has been in custody, Kawaum has made threats.  Because they had been going to court together, he was able to say things to her.  On one occasion he told her that she was "a stupid bitch" for squealing on him. He has told her "You ain't shit." He has also told her that she "will always be his bitch."  Although she feels that getting arrested on these charges "saved me from him," she has many psychiatric symptoms that come from prolonged and severe domestic violence.  She said:

> "I have nightmares.  I wake up screaming.  I feel like he choking me.  I wake up in a cold sweat.  It feels like he's everywhere. I dreamed that I was just laying, asleep and he broke in and raped me.  Terrible dreams. I begged them not to take me to Court with him. I pray before I go to sleep, but I still have nightmares.  I don't understand what he did to me.  I was almost going to plead to the charges, say it was me that did everything, until my grandmother told me that she would disown me.  He is in my head.  I can't get him out."

Nekeyia has a high level of continuing fear.  She said, "Kawaum still finds ways to torture me.  He texted my mom that if he find out what dude I'm talking to, he will take care of him, cause I will always be his bitch.  I understand that he's in jail, but he has another girl calling my mom and harassing her."  Nekeyia said that Kawaum got a 17-year sentence and will be in custody for at least 12 years, but she still feels afraid of what he could do, with the help of others, or when he gets out.

Her fear is a normal effect of experiencing serious domestic violence. Nightmares and intrusive recollections ("I can't get him out of my head.") are cardinal signs of Posttraumatic Stress Disorder.  The feeling that she will not be free from him, either physically or mentally is seen in women with more severe levels of abuse, where there was also a high degree of psychological manipulation and control.

### Psychological Test Results

The Personality Assessment Inventory (PAI) was administered, and it was chosen over the Minnesota Multiphasic Personality Inventory (MMPI-2) because Nekeyia's reading ability is below average for a person who finished 10th grade, and the PAI is easier to read.  She did not bring her glasses to the visiting room, and so the 344-item PAI was read to her.  A little over half-way through the test, she said her eyes hurt "a lot" from answering the bubbled answer sheet, and so I assisted by also marking the answer sheet.  With this approach, I was able to monitor each answer, and she did appear to be taking the questions seriously.

The computer-scored results demonstrated elevations on a number of validity and clinical scales which are commonly elevated in individuals subjected to serious and severe trauma from domestic violence.  She has a high elevation on

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 10

the scale Traumatic Stress and on the scale Anxiety Related Disorders.  She also has a high elevation on the scale Paranoia.  This scale is commonly elevated in battered women who continue to be fearful of the perpetrator, and she has described her fear in the interview (see above).  Nekeyia also has some features of a personality disorder, with indications for Borderline Personality Disorder as well as features of Antisocial Personality Disorder.  Borderline Personality Disorder is commonly seen in individuals who were exposed to abuse as children.  The antisocial features result from her honesty about the acting out behaviors of her adolescence and her admission that her behavior in the current offense broke the law, as well as her admission that she has a lot of residual anger at Kawaum.

*Opinions*

Nekeyia Weatherspoon was raised in a home with severe domestic violence. She witnessed her mother being beaten on many occasions.  Her mother seemed unable to help herself or shield her children—creating the role model of a woman who simply accepts domestic violence.  Feeling unable to cope with the chaos in her home, Ms. Weatherspoon made an early exit from the home and received little assistance with the symptoms that come in child witnesses to domestic violence. These symptoms were in full display when she moved in with her grandmother and led to much acting-out, which was unsuccessfully addressed by the Dependency Court.

In the time-frame of the instant offense, Ms. Weatherspoon clearly had the effects of Intimate Partner Battering (aka Battered Woman Syndrome).  She had been dominated and controlled by the co-defendant for over a year.  The abuse included beating, threats, verbal abuse, humiliation (by posting nude pictures of her), and being kept prisoner in a room.  At the very time of the instant offense, she had just given birth to a baby girl—Scott's child—and was pressured to prostitute herself while she was still bleeding from childbirth.  It seems clear that in her mind, bringing another person into the prostitution was about her survival. She was not in a normal state of mind.  She tried to get away from Scott at several different points, but came to feel that she would not be able to get away from him.  He enhanced this feeling by alternating threats with statements of love, the latter being very compelling to this sad and fearful girl.

Ms. Weatherspoon still very clearly shows the effects of IPB and Posttraumatic Stress Disorder.  This is a more serious form of PTSD than is seen from brief traumatic events.  She is plagued by intrusive memories of Scott and nightmares, and continues to fear that her life and the lives of her loved ones are in danger. Although I found her very hesitant to take medication for her symptoms, her test results indicate that she is very open treatment and very motivated to make changes in her life.  She is aware that she will likely be in Federal custody

RE: Nekeyia Weatherspoon
Case No: ED CR13-116VAP(2)
Page 11

serving her sentence.  She will probably need psychiatric support services for PTSD during her Federal sentence.

If I can answer additional questions, or clarify any of the above, please don't hesitate to contact me.

Respectfully Submitted,

Nancy Kaser-Boyd, Ph.D., A.B.A.P.
Clinical and Forensic Psychologist
Member, Superior Court Expert Panel
Associate Clinical Professor
Geffen School of Medicine at UCLA
Semel Institute for Neuroscience and Human Behavior

Email: RESCOTT20@Prodigy.net

# PROOF OF SERVICE

STATE OF CALIFORNIA
COUNTY OF RIVERSIDE

I am employed in the County of Riverside, State of California.  I am over the age of 18 years and not a party to the within action; my business address is 125 Business Center Drive #C, Corona, CA 91720.

On 8/17/14, I served [  ] the original [X] a true copy of the following document(s) described as **DEFENDANT'S SENTENCING MEMORANDUM** on the interested parties in this action as follows:

ROBERT LEONING, U.S. Probation Officer, 312 No. Spring St., Los Angeles,  CA 90012

☐ BY MAIL - I caused such envelope(s) with postage thereon fully prepaid, to be deposited in the U.S. Mail at Corona, California, to the below mentioned addressee(s).

☒ BY MAIL - I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice, this document will be deposited with the U.S. Postal Service on this date with postage thereon fully pre-paid at Corona, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ BY PERSONAL SERVICE - I caused such envelope(s) to be delivered by hand to the below mentioned addressee(s).

☐ BY FEDERAL EXPRESS - I am readily familiar with the firm's practice for collection and processing correspondence for mailing. Under that practice, this document will be deposited with Federal Express overnight delivery service and delivered to the following addressee(s) by 12:00 noon on the following day.

☐ BY TELECOPIER - I caused such document(s) to be transmitted to the telephone numbers indicated above on _____.

☐ (STATE) **I DECLARE UNDER PENALTY OF PERJURY** under the laws of the State of California that the foregoing is true and correct.

☒ (FEDERAL) **I DECLARE UNDER PENALTY OF PERJURY** under the laws of the United States of America that the I am employed in the office of a member of the bar of this Court at whose direction the service was made.

EXECUTED on 8/17/14, at Corona, California.

_____/s/_____
R.E. SCOTT